44 July 17, 2025 No. 30

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

v.

GERARDO BETANCOURT,
*Petitioner on Review.*

(CC 22CR03917) (CA A179535) (SC S071177)

En Banc

On review from the Court of Appeals.*

Argued and submitted March 7, 2025, at Willamette University College of Law, Salem, Oregon.

James H. Brewer, Deputy Public Defender, Oregon Public Defense Commission, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section.

Jonathan N. Schildt, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

BUSHONG, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____

* Appeal from Polk County Circuit Court, Matthew L. Tracey, Judge. 332 Or App 671 (2024) (nonprecedential memorandum decision).

**BUSHONG, J.**

A police officer stopped the motor vehicle that defendant had been driving after learning that the vehicle's registered owner had a suspended license, but before the officer could identify the driver. Defendant moved to suppress the evidence resulting from the stop, contending that the officer did not have reasonable suspicion to stop his vehicle because the officer had not identified the driver before initiating the stop. The trial court denied the motion, concluding that it was reasonable for the officer to infer that the registered owner of the vehicle was driving it, and defendant was convicted of driving with a suspended license, ORS 811.182(4). On appeal, defendant acknowledged that the stop would be lawful under the controlling Court of Appeals case law, *State v. Panko*, 101 Or App 6, 788 P2d 1026 (1990), but he contended that *Panko* was wrongly decided and should be overruled. The Court of Appeals disagreed, concluding that *Panko* was not "plainly wrong" and, thus, was binding on that court. *State v. Betancourt*, 332 Or App 671, 673 (2024) (nonprecedential memorandum decision). We allowed review and now affirm the decision of the Court of Appeals.

Under our prior case law, an officer has reasonable suspicion to make an investigatory stop when the officer believes, based on specific articulable facts, that the person stopped has committed or is about to commit a specific crime or type of crime, and that belief is objectively reasonable under the circumstances. Here, defendant does not dispute that the arresting officer in this case believed that the driver had committed the offense of driving while suspended, but he contends that that belief was not objectively reasonable because it was based solely on the officer's intuition or a statistical likelihood that the driver was the vehicle's owner, not on any specific, articulable facts about this defendant. We disagree.

As we will explain, we conclude that the officer's suspicion that defendant was driving with a suspended license was objectively reasonable because (1) the officer saw a vehicle being driven on a public road that matched the license plate and description of a vehicle registered to defendant; (2) the officer knew that defendant's driver's license

was suspended at the time; and (3) the officer confirmed that defendant was the sole registered owner of that vehicle. Those facts made the officer's inference that defendant was driving his vehicle while suspended objectively reasonable, and the possibility that defendant may have allowed some-one else to drive his vehicle did not undercut the reasonable-ness of that inference. Accordingly, we affirm the decision of the Court of Appeals.

## I.  BACKGROUND

In reviewing a denial of a motion to suppress, we are bound by a trial court's findings of historical fact that are supported by evidence in the record, and if the trial court does not make findings on all the pertinent facts, we pre-sume that the trial court found the facts consistent with its ultimate conclusion as long as there is evidence in the record to support them. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017); *State v. Holdorf*, 355 Or 812, 814, 333 P3d 982 (2014). In this case, the trial court did not make specific factual findings, stating instead that everything the arresting officer said during his testimony on the motion to suppress was "accurate." Accordingly, we summarize that testimony from the trial court record.

The arresting officer, Detective Fleming of the Independence Police Department, was on traffic patrol in a marked police car when he observed a black Chevy Silverado drive past. From his vantage point, Fleming was able to see the vehicle's license plate but not the driver. Fleming entered the license plate information into his computer and learned from Department of Motor Vehicles (DMV) records that defendant was the vehicle's sole registered owner, and that defendant's Oregon driver's license was suspended "at a mis-demeanor level."[1] Fleming began following the vehicle and accessed a DMV photograph of the registered owner on his computer, but he did not initially compare the DMV photo with the driver because the road did not have another lane that would allow him to safely drive alongside the vehicle.

---

[1] Under Oregon law, driving while suspended can be a violation (ORS 811.175), a misdemeanor (ORS 811.182(4)), or a felony (ORS 811.182(3)), depend-ing on the basis for the suspension. Fleming's reference to "a misdemeanor level" meant that, based on the reason for the suspension, defendant would be commit-ting a misdemeanor if he was driving the vehicle.

Fleming instead initiated a stop by activating his overhead lights.

Fleming explained that he had relied on his knowledge that the registered owner's license was suspended at the misdemeanor level. Fleming further explained that, in the City of Independence, traffic patrol is a "key component" of police work, and that, based on his experience conducting more than a hundred vehicle stops, the person driving the vehicle is "usually" the vehicle's registered owner.

After the Silverado pulled over, Fleming approached the vehicle on foot and saw that the driver matched the DMV photo, thereby confirming his suspicion that the driver was defendant, the registered owner. Fleming issued defendant a citation for the misdemeanor offense of driving while suspended.

Defendant moved to suppress evidence obtained because of the stop, including Fleming's identification of the vehicle's driver. Defendant contended that, under Article I, section 9, of the Oregon Constitution, reasonable suspicion to stop a vehicle to investigate the crime of driving while suspended requires the police officer to confirm that the person driving matched the description of the vehicle's registered owner before the officer can lawfully stop the vehicle. The trial court denied the motion, and defendant entered a conditional guilty plea, reserving his right to appeal the denial of his motion to suppress.

The Court of Appeals affirmed the conviction, concluding that, under *Panko*, 101 Or App at 9, an officer may reasonably infer that the driver of a vehicle is likely the vehicle's registered owner without seeing the driver, unless other circumstances put the officer on notice that the driver is not the vehicle's owner. *Betancourt*, 332 Or App at 673. We allowed review to decide whether, under Article I, section 9, reasonable suspicion to stop someone for driving while suspended requires the officer to confirm the driver's identity before the stop.[2]

_____

[2] Defendant does not contend that the Fourth Amendment to the United States Constitution required suppression of the evidence. The United States Supreme Court has held that the Fourth Amendment would not require suppression under these circumstances because, when an officer knows that a vehicle's

## II.  DISCUSSION

### A.  *Reasonable Suspicion Standard Under the Oregon Constitution*

It is well-established under Oregon law that, for a court to determine that an investigative stop was lawful under Article I, section 9, the court must find that the officer "actually suspected" that the stopped person had committed or was about to commit a specific crime or type of crime, and the court must conclude that the officer's subjective belief "was objectively reasonable under the totality of the circumstances existing at the time of the stop." *Maciel-Figueroa*, 361 Or at 182. As noted above, defendant does not dispute that Fleming, the arresting officer in this case, "actually suspected" that defendant had committed the crime of driving while suspended. Instead, defendant contends that Fleming's suspicion was not "objectively reasonable" under the circumstances.

Objective reasonableness "presents a question of law that requires an independent assessment by the court." *State v. Miller*, 363 Or 374, 386, 422 P3d 240, *adh'd to as modified on recons*, 363 Or 742, 428 P3d 899 (2018). Accordingly, we review the trial court's assessment of "objective reasonableness" for legal error. *Id*. (applying principle). To put that issue into context, it is helpful to explain how it fits within the "reasonable suspicion" standard.

In *Maciel-Figueroa*, we examined "the foundation" of that standard and this court's "historical formulations" of it in detail. *Id.* at 170-71. As we explained, the term "reasonable suspicion" implements the prohibition in Article I, section 9, against "unreasonable" seizures "by recognizing that, in some cases, it will not be constitutionally unreasonable for the police to seize a citizen without a warrant."[3] *Id.* at 171. The standard for "reasonable suspicion" balances the

_____

registered owner does not have a valid license, the officer has reasonable suspicion to stop the vehicle based on the "commonsense inference that [the registered owner is] likely the driver of the vehicle." *Kansas v. Glover*, 589 US 376, 381, 140 S Ct 1183, 206 L Ed 2d 412 (2020). We discuss *Glover* later in this opinion.

[3] Article I, section 9, provides that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

"practical necessities of effective law enforcement" with the need to "prevent arbitrary and oppressive interference" with individual privacy and personal security. *Id.* (internal quotation marks and citations omitted). The standard recognizes that an investigatory stop, "although less intrusive than an arrest, is still a constitutionally significant seizure." *Id.*

We have indicated that, in applying the Article I, section 9, reasonable suspicion standard, this court "will borrow" from decisions applying the statutory standards for criminal investigatory stops set out in ORS 131.615 and ORS 131.605(6). *Id.* at 171-72. Under ORS 131.615(1), a police officer who "reasonably suspects" that a person has committed or is about to commit a crime may stop that person to investigate. An officer "reasonably suspects" criminal conduct when the officer "holds a belief" that the person has committed or is about to commit a crime and that belief "is reasonable under the totality of the circumstances" existing at the time and place of the stop. ORS 131.605(6). Oregon case law on the reasonable-suspicion standard "has developed over the last half-century based in part on an officer's statutory authority to conduct a criminal investigative stop and in part on the constitutional limits that Article I, section 9, imposes on that authority." *Maciel-Figueroa*, 361 Or at 172.

The statutes governing investigatory stops were a legislative effort to codify the constitutional limitations that the United States Supreme Court had adopted under the Fourth Amendment in *Terry v. Ohio*, 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968), and that this court had adopted under Article I, section 9, in *State v. Cloman*, 254 Or 1, 6, 456 P2d 67 (1969). *See State v. Watson*, 353 Or 768, 775-76, 305 P3d 94 (2013) (so stating); *State v. Valdez*, 277 Or 621, 624-26, 561 P2d 1006 (1977) (describing the origin of stop statutes); *see also Holdorf*, 355 Or at 818 (stating that ORS 131.615 "was a legislative effort to codify state and federal case law permitting the temporary and limited restraint on liberty interests by police officers incident to investigatory stops").

As a result, we have determined that the analysis of a defendant's rights under ORS 131.605 to 131.625 "is substantially the same" as the analysis of a defendant's rights under the search and seizure provisions of the Oregon and

federal constitutions. *Id.* at 818-19; *see also State v. Toevs*, 327 Or 525, 534, 964 P2d 1007 (1998) (so stating); *State v. Kennedy*, 290 Or 493, 497, 624 P2d 99 (1981) (same). Because the statutory and constitutional standards are "substantially the same," this court "has decided relatively few cases since the 1969 *Cloman* decision that specifically address the constitutional dimensions of the reasonable-suspicion standard." *Maciel-Figueroa*, 361 Or at 173 (citation and internal quotation marks omitted).

As noted above, an officer has reasonable suspicion to conduct an investigatory stop without violating Article I, section 9, if the officer "actually suspect[s]" that the stopped person had committed or was about to commit a specific crime or type of crime, and the court concludes that the officer's subjective belief "was objectively reasonable under the totality of the circumstances existing at the time of the stop." *Id.* at 182. The "variable parts" of that standard are "(1) the nature or specificity of the inference that justifies the stop, *both as to the kind of illegal activity suspected and the defendant's involvement in it*, and (2) the kind and quantum of evidence required to establish that inference." *Id.* at 178 (emphasis added).

An officer's training and experience "can be a significant consideration" in determining whether an officer had reasonable suspicion for an investigatory stop. *Miller*, 363 Or at 387; *see also Holdorf*, 355 Or at 827-28 (noting that, "[f]rom its inception, the 'reasonable suspicion' standard has included a proper regard for the experience that police officers bring with them when they encounter criminal suspects"); *State v. Miglavs*, 337 Or 1, 13, 90 P3d 607 (2004) ("[O]fficers reasonably may draw inferences about human behavior from their training and experience."). But "[o]fficer intuition and experience alone are not sufficient" to meet the objective "reasonable suspicion" test. *Holdorf*, 355 Or at 823; *see also Valdez*, 277 Or at 628 (explaining that, although experienced police officers can develop "an intuitive sixth sense" about crime, such instinct and experience cannot "form the entire basis for 'reasonable suspicion'").

Having described the standards that generally apply in determining reasonable suspicion and whether an

officer's suspicion is objectively reasonable, we turn to applying those standards to the circumstances in this case.

### B.  *Application to This Case*

We begin by noting that the two types of inferences that can be relevant to the reasonable suspicion inquiry identified in *Maciel-Figueroa*—namely, inferences as to the kind of illegal activity suspected and to the defendant's involvement in that activity—collapse into one in this case. The kind of illegal activity that Fleming suspected here— driving while suspended—was based on his inference that defendant, who had a suspended license, was the person driving the vehicle at the time. Thus, this case boils down to a single question: whether the record includes the kind and quantum of evidence required to make Fleming's inference that defendant was driving the vehicle at the time objectively reasonable. We conclude that it was.

Detective Fleming had personal knowledge of three facts that gave rise to his suspicion: (1) He had observed an individual driving a black Chevy Silverado on a public road, and he saw the license plate on that vehicle; (2) he learned from checking DMV records that the particular vehicle that was associated with that license plate was a black Chevy Silverado and that that vehicle had one registered owner; and (3) he further learned from those records that the registered owner of that vehicle—defendant—had a suspended license.

Those observations support the reasonable inference that the driver of the Silverado was likely to be its *sole* registered owner, absent any evidence suggesting otherwise.[4] The fact that the registered owner has a suspended

---

[4] For example, if the arresting officer had seen the driver and saw that the driver did not match the gender or race of the vehicle's registered owner, the officer would not have reasonable suspicion to stop the vehicle. Or, if a vehicle is registered to multiple owners, an officer could not necessarily infer that it was being driven by one owner and not one of the others. Moreover, in some communities, officers might be familiar with vehicles and the people who are likely to be driving them. If, for example, an officer knows that the registered owner of a vehicle has a large family, and that many family members regularly drive the vehicle, the officer may not have reasonable suspicion to stop the vehicle on the assumption that it was being driven by the registered owner at any one time. There are other examples; this is not an exclusive list. But there was no evidence in this case to dispel Fleming's inference that defendant—the sole registered owner—was driving at the time of the stop.

license does not necessarily undercut that inference, because that merely raises the possibility that someone other than the registered owner was driving the vehicle lawfully. That inference, though potentially reasonable, is not one that the officer was required to draw. It would also be reasonable to infer that the person driving the vehicle is its registered owner, absent some information to the contrary. There is no evidence in this case that dispelled Fleming's suspicion that the driver was the registered owner.

In addition, Fleming took reasonable steps under the circumstances to ensure that his suspicion was reasonable and that would have allowed him to quickly terminate the stop if he learned otherwise. For example, Fleming obtained the DMV photo of the registered owner *before* stopping the vehicle to attempt to verify his suspicion. Although the configuration of the road made it unsafe for Fleming to drive alongside the Silverado to verify that the driver matched the photo, he took reasonable steps that would have allowed him to terminate the stop as soon as he saw the driver if the driver did not match the DMV photo. There was no evidence that Fleming ignored evidence that the driver was *not* the registered owner or refused to take reasonable steps that he could have taken safely to verify his suspicion.

We note that our conclusion that Fleming's inference in this case was objectively reasonable matches the conclusion reached by the United States Supreme Court in addressing the same issue under the Fourth Amendment, *Kansas v. Glover*, 589 US 376, 140 S Ct 1183, 206 L Ed 2d 412 (2020), and by courts in almost every other jurisdiction that has addressed the issue.[5] The parties' briefing in this case

---

[5] *See Armfield v. State*, 918 NE2d 316, 321-22 (Ind 2009); *State v. Tozier*, 905 A2d 836, 838-39 (Me 2006); *State v. Pike*, 551 NW2d 919, 922 (Minn 1996); *State v. Neil*, 350 Mont 268, 270-71, 207 P3d 296, 297-98 (2009); *State v. Richter*, 145 NH 640, 641-42, 765 A2d 687, 689 (2000); *State v. Donis*, 157 NJ 44, 58, 723 A2d 35, 41-42 (1998); *State v. Edmonds*, 192 Vt 400, 404, 58 A3d 961, 964-65 (2012); *State v. Smith*, 379 Wis 2d 86, 98, 905 NW2d 353, 359 (2018); *see also People v. Cummings*, 46 NE3d 248, 249 (Ill 2016) (concluding that officer's inference that a vehicle's owner was the driver was reasonable where the officer stopped the vehicle to arrest the driver on a warrant); *Traft v. Commonwealth*, 539 SW3d 647, 651 (Ky 2018) (same). Defendant cites no authority to the contrary, but the state notes that an intermediate appellate court in Georgia required an officer to attempt to identify the driver before stopping the vehicle. *State v. Martinez-Arvealo*, 340 Ga App 271, 271, 797 SE2d 181, 182 (2017).

addresses the Supreme Court's analysis in *Glover* in some detail, with the state urging us to reach the same result that the Supreme Court reached in that case, and defendant pointing out what he perceives to be flaws in *Glover*'s analysis.

But our analysis of search and seizure issues under Article I, section 9, is a separate issue, distinct from the Supreme Court's Fourth Amendment jurisprudence. As we have stated, we "remain free *** to interpret our constitutional provision regarding search and seizure and to impose higher standards *** than are required by the federal constitution." *State v. Caraher*, 293 Or 741, 750, 653 P2d 942 (1982). In fact, we have stated that that "is part of a state court's duty of independent constitutional analysis." *Id*.

Thus, our prior Article I, section 9, cases have often departed from the Supreme Court's Fourth Amendment analysis. *See, e.g.*, *State v. Kreis*, 365 Or 659, 665, 451 P3d 954 (2019) (holding that, unlike the Fourth Amendment, reasonable suspicion under Article I, section 9, requires an officer to have "a subjective belief that the person stopped has committed, or is about to commit, a crime"); *Maciel-Figueroa*, 361 Or at 180 (holding that, unlike the Fourth Amendment, Article I, section 9, requires a reasonable suspicion that a person has committed or is about to commit "a specific crime or type of crime"); *State v. Dixson/Digby*, 307 Or 195, 208, 766 P2d 1015 (1988) (holding, contrary to the federal rule, that the curtilage of property is constitutionally protected from warrantless searches under Article I, section 9).[6] Accordingly, the issue here is whether Fleming had reasonable suspicion sufficient to justify the stop under Article I, section 9, not whether we should follow the Supreme Court's lead in *Glover*.

---

[6] Our past Article I, section 9, approach has been described as "a bit of a muddle," Jack L. Landau, *The Search for the Meaning of Oregon's Search and Seizure Clause*, 87 Or L Rev 819, 859 (2008). Former Justice Landau described the history of this court's interpretation of that provision as "a story marked by halting acceptance of state constitutionalism, followed by occasional bold departures from federal doctrines while accompanied by continued adherence to other federal doctrines with no explanation of the decision to do so." Landau, 87 Or L Rev at 819-20. Regardless of that history, we reaffirm today that, although we may be informed by the Supreme Court's Fourth Amendment cases for whatever persuasive effect those cases may have, our analysis of Article I, section 9, is separate and distinct from the Supreme Court's analysis of the Fourth Amendment's search and seizure provisions.

Defendant contends that Fleming's inference that defendant was driving the vehicle at the time of the stop was not objectively reasonable because that inference is supported only by a statistical likelihood that the driver of a vehicle at any given time is likely to be its registered owner, not by any "specific and articulable" facts, *Maciel-Figueroa*, 361 Or at 182, that are "particularized to the individual based on the individual's own conduct," *Kreis*, 365 Or at 665. We disagree. As explained above, Fleming's subjective suspicion was based in part on specific facts that were particularized to defendant and his registered vehicle—not statistical evidence—along with Fleming's common sense and his experience in conducting traffic stops. Common sense alone is enough to make the inference that the sole registered owner of a vehicle was likely to be the person driving it at any given time objectively reasonable, absent any evidence that the driver was *not* the vehicle's registered owner.

Defendant also contends that such an inference is undermined when the registered owner had a suspended license, because there is no evidence in the record that people with a suspended driver's license will frequently continue to drive. But this court's Article I, section 9, jurisprudence does not require certainty or even probability for suspicion to be reasonable. The reasonable suspicion standard does not require evidence to negate the possibility that a person with a suspended license would follow the law. Moreover, the fact that the Oregon legislature has provided for license revocation for "habitual offender[s]" who have three or more driving while suspended convictions within a five-year period, ORS 809.600(1)(c), demonstrates that the legislature understood that persons with suspended licenses may continue to drive.[7]

In summary, Fleming had personal knowledge of three facts that are particular to this defendant and the

---

[7] The state contends that that understanding is also supported by the empirical studies that were cited in *Glover* and by other studies. For example, the state cited a study estimating that "up to 75% of suspended drivers continue to drive." American Ass'n of Motor Vehicle Administrators, *Reducing Suspended Drivers and Alternative Reinstatement Best Practices* 8 (May 2021), https://aamva.org/getmedia/b92cc79d-560f-4def-879c-6d6e430e4f4d/Reducing-Suspended-Drivers-and-Alternat%20ive- (accessed June 13, 2025). However, we need not rely on empirical studies in this case because the circumstances in the record alone are sufficient to establish that Fleming's suspicion that defendant was driving at the time of the stop was objectively reasonable.

circumstances of this case: (1) He had observed an individ-
ual driving a black Chevy Silverado on a public road, and
he saw the license plate on that vehicle; (2) he knew from
checking DMV records that the vehicle associated with
that license plate was a black Chevy Silverado, and that
the vehicle had one registered owner; and (3) he also knew
from those records that the vehicle's registered owner had
a suspended license. He made a reasonable inference from
those facts that the driver was likely the vehicle's registered
owner.

We conclude that, under those circumstances, an
officer's inference that the registered owner of a vehicle was
likely to be driving it—even if the owner had a suspended
driver's license at the time—can be objectively reasonable,
absent any evidence suggesting that the registered owner
was not the driver. And because there was no such evidence
in this case, we hold that Fleming's inference that defen-
dant was driving the vehicle at the time of the stop was
objectively reasonable. Accordingly, the stop did not violate
Article I, section 9, and the trial court did not err in denying
defendant's motion to suppress evidence obtained after that
stop.

The decision of the Court of Appeals and the judg-
ment of the circuit court are affirmed.